SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**In re Adoption of N.J.A.C. 5:96 & 5:97 by N.J. Council on Affordable Housing (A-90 to -94-10) (067126)**

**Argued November 14, 2012 -- Decided September 26, 2013**

**LaVECCHIA, J., writing for a majority of the Court.**

In this appeal, the Court considers the validity of the most recent iteration of regulations applicable to the third round of municipal affordable housing obligations (Third Round Rules) adopted pursuant to the Fair Housing Act (FHA), L. 1985, c. 222; see N.J.S.A. 52:27D-302. With those regulations, the Council on Affordable Housing (COAH) proposed a "growth share" methodology for assessing prospective need in allocating a municipality's fair share of the region's need for affordable housing.

The Court's Mount Laurel decisions recognized a constitutional obligation that municipalities, in the exercise of their delegated power to zone, "afford[] a realistic opportunity for the construction of [their] fair share of the present and prospective regional need for low and moderate income housing." S. Burlington Cnty. NAACP v. Twp. of Mount Laurel, 92 N.J. 158 (1983) [hereinafter Mount Laurel II] (citing S. Burlington Cnty. NAACP v. Twp. of Mount Laurel, 67 N.J. 151 (1975) [hereinafter Mount Laurel I]). Mount Laurel I was followed by years of political inertia, failing to address the constitutional deprivation affecting the least fortunate in our society. The Court preferred a legislative solution. However, in the absence of a legislative response, the Court was compelled in Mount Laurel II to fashion a remedy designed to curb exclusionary zoning practices and to foster development of affordable housing for low- and moderate-income individuals.

Thereafter, the Legislature enacted the FHA, which codified the core constitutional holding undergirding the Mount Laurel obligation and included particularized means by which municipalities could satisfy their obligation, mirroring the judicially crafted remedy. The FHA also created COAH, N.J.S.A. 52:27D-305, and provided it with rulemaking and adjudicatory powers to execute the provision of affordable housing. In regulations covering prior time periods (the First Round Rules and Second Round Rules), the methodologies used by COAH largely followed the remedial approaches established in Mount Laurel II.

In this case, the Court reviews the Appellate Division's invalidation of the most recent iteration of the Third Round Rules. In the Third Round Rules, COAH proposed a new approach—a "growth share" methodology—for assessing prospective need in the allocation of a municipality's fair share of the region's need for affordable housing. In its decision, the Appellate Division expressed doubt about whether any growth share methodology could be compatible with the Mount Laurel II remedy for determining a municipality's affordable housing obligation. In re Adoption of N.J.A.C. 5:96 & 5:97, 416 N.J. Super. 462 (App. Div. 2010). That overarching question looms over all other issues in this challenge to the Third Round Rules.

**HELD**: The Third Round Rules are at odds with the FHA, which incorporated the Mount Laurel II remedy. Although that remedy imposed thirty years ago should not be viewed as a constitutional straightjacket to legislative innovation of a new remedy responsive to the constitutional obligation, the FHA remains the current framework controlling COAH's actions. With respect to the current version of the FHA, the Third Round Rules are ultra vires.

1. Under the revised Third Round Rules, a municipality accrues its affordable housing obligation as a percentage of growth that actually occurs within its borders. The growth share obligation is based on ratios formulated from statewide—not regional—data on projected housing need, employment and residential growth. Although COAH initially calculates a municipality's projected growth share obligation, the regulations provide that a municipality only incurs the obligation to the extent growth actually occurs. COAH's biennial review process ensures that projected growth share obligations are replaced with obligations that are proportionate to the municipality's actual residential and employment growth. (pp. 29-36)

2. The Court imposed a judicial remedy in Mount Laurel II because of municipal inertia toward allowing affordable housing. Prospective regional need was conceived as an ascertainable figure to be calculated before determining specific municipal obligations. To the extent the growth share approach is not based on region-specific data and is not structured to establish a firm obligation in respect of prospective affordable housing need, it is inconsistent with the Mount Laurel II remedy. However, the Court recognizes that its analysis cannot, and does not, end there. In the three decades since Mount Laurel II, many changed circumstances have influenced the development of housing in New Jersey. In light of those changes, there may be reasonable bases for considering alternative approaches to promote the production of affordable housing. The constitutional obligation reaffirmed and refined in Mount Laurel II is distinct from the judicial remedy embraced by the Court. The Legislature may wish to consider the benefits of an alternate remedy that accounts for current circumstances. The judicial remedy imposed in Mount Laurel II is not a straightjacket to legislative innovation for satisfaction of the constitutional obligation. (pp. 36-46)

3. That said, the Third Round Rules' validity hinges on whether they are consistent with the FHA. The FHA's framework is replete with references tying affordable housing obligations to a region, not obligations formed on a statewide basis, and it requires a specifically allotted number of units for satisfaction of both present and prospective need based on a housing region. Although Section 307 of the FHA permits COAH to adjust prospective need methodology based on decisions of other branches of government, that oblique reference does not authorize the agency to rewrite such core aspects of its enabling legislation, which are premised on an allocation basis for prospective need within a housing region. The policy adopted by the Legislature cannot be rewritten by COAH to the degree it has done through the growth share methodology. The FHA tracked the Mount Laurel II allocation methodology for satisfaction of present and prospective need based on housing region. COAH was not free to abandon that approach, and the Court is not free to ignore the legislative choice. The growth share methodology is inconsistent with the FHA and thus COAH's regulations are ultra vires. The Legislature may determine to authorize new avenues for addressing regional need and the promotion of affordable housing. (pp. 46-53)

4. The growth share methodology is so intertwined with the new regulatory scheme that it cannot be severed. The Court's conclusion requires a new adoption of regulations to govern the third round municipal obligations consistent with the strictures of the FHA. New rules cannot wait further while time is lost during deliberations on a new affordable housing approach. A remedy must be put in place to eliminate the limbo in which municipalities, New Jersey citizens, developers, and affordable housing interest groups have lived for too long. Accordingly, the Court endorses the Appellate Division's five-month deadline for reimposing third-round obligations based on the previous rounds' method of allocating fair share obligations among municipalities. The Court notes the remedy is the remedial formula adopted by COAH, consistent with the FHA, and one even COAH agrees can be implemented quickly. (pp. 53-59)

**JUSTICE HOENS**, **DISSENTING**, joined by **JUSTICE PATTERSON**, agrees that the judicial remedy created thirty years ago is not the only constitutionally permissible method for providing affordable housing, but expresses the view that the growth share approach is consistent with both Mount Laurel II and the FHA.

The judgment of the Appellate Division is **AFFIRMED AS MODIFIED**.

**JUSTICE ALBIN and JUDGE RODRÍGUEZ (temporarily assigned) join in JUSTICE LaVECCHIA's opinion. JUSTICE HOENS filed a separate, dissenting opinion in which JUSTICE PATTERSON joins. CHIEF JUSTICE RABNER and JUDGE CUFF (temporarily assigned) did not participate.**

IN THE MATTER OF THE ADOPTION
OF N.J.A.C. 5:96 AND 5:97 BY
THE NEW JERSEY COUNCIL ON
AFFORDABLE HOUSING.

Argued November 14, 2012 – Decided September 26, 2013

On certification to the Superior Court,
Appellate Division whose opinion is reported
at 416 N.J. Super. 462 (2010).

Edward J. Buzak argued the cause for
appellant and cross-respondent New Jersey
State League of Municipalities (The Buzak
Law Group, attorneys).

Jonathan E. Drill argued the cause for
appellants and cross-respondents Clinton
Township, Bedminster Township, Bernards
Township, Bethlehem Township, Town of
Clinton, Greenwich Township, Montgomery
Township, Peapack-Gladstone Borough,
Readington Township, Roseland Borough, Union
Township and Marvin J. Joss (Stickel, Koenig
& Sullivan, attorneys; Stuart R. Koenig, on
the briefs).

Kevin D. Walsh argued the cause for
appellant and cross-respondent Fair Share
Housing Center (Mr. Walsh, attorney; Mr.
Walsh and Adam M. Gordon, on the briefs).

1

Stephen M. Eisdorfer argued the cause for respondent New Jersey Builders Association (Hill Wallack, attorneys; Mr. Eisdorfer and Thomas F. Carroll, III, on the brief).

Geraldine Callahan, Deputy Attorney General, argued the cause for respondent New Jersey Council on Affordable Housing and Commissioner of the Department of Community Affairs (Jeffrey S. Chiesa, Attorney General of New Jersey, attorney; Ms. Callahan, George N. Cohen, and Donald M. Palombi, Deputy Attorneys General on the briefs).

Jeffrey R. Surenian argued the cause for respondents and cross-appellants Borough of Atlantic Highlands and Township of Middletown (Jeffrey R. Surenian and Associates, attorneys; Mr. Surenian, Nancy L. Holm, Michael A. Jedziniak, and Donna A. McBarron, on the briefs).

Kevin J. Moore argued the cause for respondent New Jersey Chapter of the National Association of Industrial and Office Properties (Sills Cummis & Gross P.C., attorneys; Mr. Moore and Peter M. Flannery, on the brief).

Jeffrey L. Kantowitz argued the cause for respondents Kenneth Martin, Alice Martin and MTAE, Inc. (Law Office of Abe Rappaport, attorneys).

Tracy A. Siebold submitted a brief on behalf of amici curiae The Corporation for Supportive Housing and Supportive Housing Association of New Jersey (Ballard Spahr, attorneys).

Kenneth H. Zimmerman and Catherine Weiss submitted a brief on behalf of amici curiae New Jersey Future, American Planning Association, American Planning Association-New Jersey Chapter, and the Housing & Community Development Network of New Jersey (Lowenstein Sandler, attorneys; Mr. Zimmerman, Ms. Weiss, Michael J. Hahn, Michael T.G. Long, and Ryan J. Cooper, on the brief).

Lawrence S. Lustberg submitted a brief on behalf of amici curiae New Jersey State Conference of the National Association for the Advancement of Colored People and Latino Action Network (Gibbons P.C., attorneys; Mr. Lustberg and Eileen M. Connor, on the brief).

Kevin J. Moore submitted a brief on behalf of amicus curiae The International Council of Shopping Centers (Sills Cummis & Gross, attorneys).

Georgette Castner submitted a brief on behalf of amici curiae Pennsauken Township and Montclair Township (Montgomery, McCracken, Walker & Rhoads, attorneys; Ms. Castner and Myron Orfield, a member of the Minnesota bar, on the brief).

Ronald K. Chen submitted a brief on behalf of amicus curiae American Civil Liberties Union of New Jersey Foundation (Mr. Chen, attorney; Mr. Chen, Edward L. Barocas, Jeanne M. LoCicero, and Alexander R. Shalom, of counsel and on the brief).

Martin F. McKernan, Jr. submitted a brief on behalf of amici curiae Catholic Charities,

Diocese of Camden, Inc., Catholic Charities,
Diocese of Metuchen, Catholic Charities,
Diocese of Paterson, and Catholic Charities,
Diocese of Trenton (McKernan McKernan &
Godino, attorneys).

Melville D. Miller, Jr., President, and
Connie M. Pascale submitted a brief on
behalf of amicus curiae Legal Services of
New Jersey (Mr. Miller, attorney).

JUSTICE LaVECCHIA delivered the opinion of the Court.

Our Mount Laurel decisions recognized a constitutional obligation that municipalities, in the exercise of their delegated power to zone, "afford[] a realistic opportunity for the construction of [their] fair share of the present and prospective regional need for low and moderate income housing." S. Burlington Cnty. NAACP v. Twp. of Mount Laurel, 92 N.J. 158, 205 (1983) [hereinafter Mount Laurel II] (citing S. Burlington Cnty. NAACP v. Twp. of Mount Laurel, 67 N.J. 151, 174, appeal dismissed and cert. denied, 423 U.S. 808, 96 S. Ct. 18, 46 L. Ed. 2d 28 (1975) [hereinafter Mount Laurel I]). Mount Laurel I was followed by years of political inertia, failing to address the constitutional deprivation affecting the least fortunate in our society. We preferred a legislative solution. However, in the absence of a legislative response to the constitutional imperative set forth in Mount Laurel I, we were compelled in Mount Laurel II to fashion a remedy that was necessary to meet

4

the urgency of the problem.  It was designed to curb exclusionary zoning practices and to foster development of affordable housing for low- and moderate-income individuals.  It also was an extraordinarily detailed remedy.

Thereafter, the Legislature enacted the Fair Housing Act (FHA), L. 1985, c. 222.  See N.J.S.A. 52:27D-302; Hills Dev. Co. v. Twp. of Bernards, 103 N.J. 1, 19 (1986).  The FHA codified the core constitutional holding undergirding the Mount Laurel obligation, see In re Petition for Substantive Certification Filed by Twp. of Warren, 132 N.J. 1, 12 (1993) (citing to Mount Laurel obligation found in N.J.S.A. 52:27D-302(a), (d), (e), -311(a), -314(a), (b)), and included particularized means by which municipalities could satisfy their obligation, mirroring the judicially crafted remedy.  Further, the FHA created the Council on Affordable Housing (COAH), N.J.S.A. 52:27D-305, and provided it with rulemaking and adjudicatory powers to execute the provision of affordable housing.  Hills, supra, 103 N.J. at 19-20.

In this matter, we review the Appellate Division's invalidation of the most recent iteration of COAH regulations applicable to the third round of municipal affordable housing obligations (Third Round Rules).  In the Third Round Rules, COAH proposed a new approach -- a "growth share" methodology -- for

5

assessing prospective need in the allocation of a municipality's fair share of the region's need for affordable housing. In invalidating the Third Round Rules, the Appellate Division expressed doubt about whether any growth share methodology adopted by COAH could be compatible with the Mount Laurel II remedy that "appears to militate against the use of" a growth share approach for determining a municipality's affordable housing obligation. In re Adoption of N.J.A.C. 5:96 & 5:97, 416 N.J. Super. 462, 485 (App. Div. 2010). That overarching question looms over all other issues in this challenge to the Third Round Rules.

Having had three decades of experience with the current affordable housing remedy, we cannot say that there may not be other remedies that may be successful at producing significant numbers of low- and moderate-income housing -- remedies that are consistent with statewide planning principles, present space availability, and economic conditions. New Jersey in 2013, quite simply, is not the same New Jersey that it was in 1983. Changed circumstances may merit reassessing how to approach the provision of affordable housing in this state. Assumptions used in devising a remedy in 1983 do not necessarily have the same validity today. That assessment, however, is best made by the policymakers of the Legislature who can evaluate the social

science and public policy data presented to this Court. Indeed, at oral argument, the many parties to this litigation were questioned as to whether their arguments were better suited for legislative hearings on the subject.

That said, our response to the overarching question previously identified is that the constitutional obligation and the judicial remedy ordered by this Court in Mount Laurel II, and in place today through the FHA, are distinct and severable. The exceptional circumstances leading this Court to create a judicial remedy thirty years ago, which required a specific approach to the identification and fulfillment of present and prospective need for affordable housing in accordance with housing regions in our state, should not foreclose efforts to assess whether alternative approaches are better suited to modern planning, development, and economic conditions in the Garden State. The policymaking branches may arrive at another approach to fulfill the constitutional obligation to promote ample affordable housing to address the needs of the people of this state and, at the same time, deter exclusionary zoning practices. We hold that our remedy, imposed thirty years ago, should not now be viewed as a constitutional straightjacket to legislative innovation.

7

However, unless the Legislature amends the FHA, which tracks the judicial remedy in its operative provisions, the present regulations premised on a growth share methodology cannot be sustained. The changes in the Third Round Rules are beyond the purview of the rulemaking authority delegated to COAH because they conflict with the FHA, rendering the regulations ultra vires.

Moreover, due to COAH's failure to enact lawful regulations to govern municipalities' ongoing obligations to create affordable housing under the FHA, we have no choice but to endorse the remedy imposed by the Appellate Division in order to fill the void created by COAH. COAH shall adopt regulations, as directed by the Appellate Division, without delay. As modified by this opinion, we thus affirm the Appellate Division's judgment with respect to the invalidity of the Third Round Rules under the FHA as expressed in the Honorable Stephen Skillman's comprehensive opinion.

I.

The following summary of the Mount Laurel doctrine outlines the key points in its development through a series of cases, the FHA's enactment, and prior regulations.

A.

In Mount Laurel I, supra, this Court held that a developing municipality could not utilize its zoning power to eliminate the realistic possibility of construction of affordable low- and moderate-income housing without acting in a manner contrary to the state's general welfare. 67 N.J. at 174. We explained that zoning decisions involve the exercise of police powers and have a "substantial external impact" on neighboring areas. Id. at 177. Thus, we reasoned that the adoption of zoning ordinances having an exclusionary effect required, under our State Constitution, a developing municipality to consider and serve the interests of citizens beyond its borders. Id. at 174-75, 177. Consequently, Mount Laurel I prohibited the discriminatory use of zoning powers and mandated that developing municipalities like Mount Laurel affirmatively act to make housing available to their fair share of the region's present and prospective need for low- and moderate-income housing. Id. at 187-88.

Despite the constitutional "general welfare" pronouncement in Mount Laurel I, the holding's impact was stunted by the absence of critical definitions, such as a "municipality's fair share" and the "present and prospective regional need." See, e.g., Oakwood at Madison, Inc. v. Twp. of Madison, 72 N.J. 481, 499 (1977) (declining to define ambiguous term "fair share"). Its impact also was limited by its restriction to developing

9

municipalities, rather than all communities.  See, e.g., Pascack Ass'n v. Mayor & Council of Washington, 74 N.J. 470, 483-84 (1977) (finding Mount Laurel doctrine only applied to developing municipalities when considering challenge to zoning ordinance in "fully developed, predominantly single-family residential community").  Moreover, municipalities continued to resist applying zoning ordinances in non-exclusionary manners and failed to provide for the creation of affordable housing.

In response, our 1983 decision in Mount Laurel II, supra, strengthened the Mount Laurel doctrine.  92 N.J. at 205.  Having already been recognized in Mount Laurel I as constitutionally required to serve human values essential to individuals beyond just those persons living within the geographic borders of a municipality, Mount Laurel II reaffirmed that a municipality's zoning power could not be utilized in contravention of the general welfare of the state and restated the legal and moral bases for its conclusion.  Id. at 208-10.  The holding emphasized that helping people secure a decent home is more than just an ideal.  Ibid.  It is a fundamental constitutional, and moral, general welfare obligation.  Ibid. Municipalities satisfy "that constitutional obligation by affirmatively affording a realistic opportunity for the construction of [their] fair share of the present and prospective regional need

10

for low and moderate income housing.  This is the core of the Mount Laurel doctrine."  Id. at 205 (internal citation omitted).

Thus, when exercising their power to zone, municipalities across the state -- not just developing municipalities -- are required to account for the housing needs of individuals residing outside of their municipalities "but within the region that contributes to the housing demand" in their municipalities. Id. at 208.  "That is the constitutional rationale for the Mount Laurel doctrine.  The doctrine is a corollary of the constitutional obligation to zone only in furtherance of the general welfare."  Id. at 209.

Municipalities' intransigence in creating affordable housing at the time Mount Laurel II was presented to the Court triggered the imposition of the judicial remedy that then was fashioned.  Id. at 199-201.  The Court in Mount Laurel II explained that its remedy "provide[d] a method of satisfying that obligation when the zoning in question affects housing." Id. at 209.  We stated that we would no longer tolerate a "numberless approach" as a remedy and that the "fair share" standard must be quantitative, not qualitative, in order to satisfy the constitutional obligation.  Id. at 222.  We proceeded to detail -- because of the absence of any legislative solution -- assumptions to be used, and those avoided, in

11

crafting a permissible formula for determining a municipality's "fair share," id. at 256-57, and a standard for evaluating a "realistic opportunity," id. at 260-61.

Extending the doctrine's reach to all municipalities, id. at 258-59, Mount Laurel II added teeth to the doctrine by adopting a judicial remedy. We created a special litigation track for exclusionary zoning cases, id. at 292-93, enumerated certain affirmative measures that would define the tools at a municipality's disposal, id. at 260-67, and sanctioned a "builder's remedy," which permits builder-plaintiffs to sue for the opportunity to construct housing at higher densities than a municipality otherwise would allow, id. at 279-81. Despite this Court's specific enforcement enhancements to the doctrine, we repeated a preference for legislative solutions in the affordable housing arena. Id. at 352. In 1985, the New Jersey Legislature heeded that call by enacting the FHA. L. 1985, c. 222; see N.J.S.A. 52:27D-302.

B.

The FHA created COAH and vested it with primary responsibility for assigning and determining municipal affordable housing obligations. N.J.S.A. 52:27D-305. The FHA charged COAH "with, among other things, determining State housing regions, estimating the State and regional present and

12

prospective need for low and moderate income housing, and adopting criteria and guidelines for a [m]unicipal determination of its present and prospective fair share of [the region's] housing need." Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 544 (2002) (internal citations and quotation marks omitted); Hills, supra, 103 N.J. at 19-20. The FHA also contained a safe haven for municipalities that bear their fair share of their region's low- and moderate-income housing need: they can seek substantive certification from COAH, N.J.S.A. 52:27D-313, which, if granted, insulates that municipality from exclusionary zoning litigation for ten years (six years as originally passed), N.J.S.A. 52:27D-313(a). The FHA transferred all pending and future Mount Laurel litigation to COAH for resolution in the first instance through the agency's administrative processes. Hills, supra, 103 N.J. at 20.

This Court upheld the FHA against a constitutional challenge, determining the statute was a valid method of creating a realistic opportunity to satisfy the state's affordable housing need. Id. at 25, 41-42; see also id. at 43 (reviewing Court's requests to Legislature to act when explaining, in part, reasoning for strong deference to Legislature).

C.

13

COAH adopted rules delineating the affordable housing obligations of municipalities for the periods of 1987 to 1993 –– the First Round Rules –– and 1993 to 1999 –– the Second Round Rules. See N.J.A.C. 5:92-1.1 to -18.20, Appendices A to F; N.J.A.C. 5:93-1.1 to -15.1, Appendices A to H. COAH subsequently readopted the Second Round Rules and established May 2004 as the new expiration date for that period of obligations.

In general, the First and Second Round Rules utilized a methodology for calculating affordable housing obligations that was consistent with the mechanisms developed by trial courts prior to the FHA's enactment. In re N.J.A.C. 5:96, supra, 416 N.J. Super. at 473; see, e.g., AMG Realty Co. v. Twp. of Warren, 207 N.J. Super. 388 (Law Div. 1984) (developing methodologies for determining affordable housing obligations). The First Round Rules specified methods for determining present need, including indigenous need and reallocated present need, and prospective need. See N.J.A.C. 5:92, Appendix A. Present need was defined as "the total number of deficient housing units occupied by low or moderate income households as of July 1, 1987." N.J.A.C. 5:92-1.3. To establish present need, COAH used several factors, including "overcrowding, age of unit, and lack of plumbing, kitchen or heating facilities as indicators of

14

dilapidated housing." In re Adoption of N.J.A.C. 5:94 & 5:95, 390 N.J. Super. 1, 23 (App. Div.), certif. denied, 192 N.J. 71, 71-72 (2007). "[E]xcess present need in urban aid municipalities was reallocated to all municipalities within the regional growth area." Ibid.; see N.J.A.C. 5:92, Appendix A (designating regional growth areas).

In contrast, prospective need was "a projection of low and moderate housing needs based on development and growth . . . reasonably likely to occur in a region or a municipality." N.J.A.C. 5:92-1.3. COAH used statistical analysis to project the number of "low- and moderate-income households" that would form between 1987 and 1993. N.J.A.C. 5:92, Appendix A at 92-49. In determining prospective need, COAH considered municipalities' "approvals of development applications, real property transfers and economic projections prepared by the State Planning Commission." N.J.A.C. 5:92-1.3.

The First Round Rules determined a municipality's allocated need "based on employment within the municipality, projected employment within the municipality, the percentage of the municipality in a growth area, and the municipality's wealth," which was similar to the calculations developed in AMG Realty, supra, 207 N.J. Super. at 398-410. In re N.J.A.C. 5:94, supra, 390 N.J. Super. at 23-24 (citing N.J.A.C. 5:92, Appendix A at

15

92-49 to -50). Unlike AMG Realty, however, COAH's methodology considered "secondary sources of housing supply and demand in calculating both statewide and regional need." In re N.J.A.C. 5:94, supra, 390 N.J. Super. at 24. COAH's First Round Rules also identified market forces that have the effect of reducing overall housing need. Ibid. (citing N.J.A.C. 5:92, Appendix A at 92-52 to -54 (addressing filtering, residential conversions, and spontaneous rehabilitation)).[1]

The Second Round Rules maintained the methodologies adopted in the First Round Rules. N.J.A.C. 5:93, Appendix A. COAH also adopted regulations that granted credits and adjustments to municipalities to reduce their fair share figures. See N.J.A.C. 5:93-2.15, -3.2 (credits for affordable housing constructed between 1980 and 1986); N.J.A.C. 5:93-3.6 (credits for substantial compliance); N.J.A.C. 5:93-5.15 (credits for rental housing); N.J.A.C. 5:93-4.2, -4.3 (adjustments for municipalities lacking sufficient vacant land or access to water

---

[1] Filtering occurs when "newer, more desirable housing options bec[o]me available in the housing market, [prompting] middle- and upper-income households [to] move out of the existing housing, making it available . . . for a lower-income household." Ibid. "'Residential conversion' occurs when additional dwelling units [are] created from already existing structures." Ibid. "'Spontaneous rehabilitation' occurs when dilapidated housing, affordable to low- and moderate-income households, [is] rehabilitated by the private market without the assistance of any government program." Ibid.

16

and sewerage).  Additionally, the Second Round Rules permitted municipalities "to satisfy up to twenty-five percent of their fair share through age-restricted affordable housing."  In re N.J.A.C. 5:94, supra, 390 N.J. Super. at 25 (citing N.J.A.C. 5:93-5.14).

Various legal challenges to COAH's First and Second Round Rules failed.  See, e.g., Twp. of Bernards v. Dep't of Cmty. Affairs, 233 N.J. Super. 1, 12-22 (App. Div.), certif. denied, 118 N.J. 194 (1989) (rejecting numerous challenges to First Round Rules, including allegation that COAH acted arbitrarily in considering municipality's wealth as allocation factor); Van Dalen v. Washington Twp., 120 N.J. 234, 246-47 (1990) (upholding COAH's reliance on planning designations in State Development Guide Plan); In re Petition for Substantive Certification Filed by Twp. of Warren, 247 N.J. Super. 146, 179-83 (App. Div. 1991) (rejecting challenge that First and Second Round Rules violated Mount Laurel doctrine because they did not require housing for most impoverished citizens), rev'd in part on other grounds, 132 N.J. 1 (1993) (invalidating occupancy preference regulation allowing municipalities to set aside fifty percent of fair share housing for low- and moderate-income persons who lived or worked in town).

17

In sum, until adoption of the Third Round Rules, the methodologies used by COAH largely followed the remedial approaches established in Mount Laurel II and AMG Realty. For two decades following Mount Laurel II, the process of allocating municipal affordable housing obligations proceeded in steps. COAH first would calculate the need for affordable housing in each of the state's regions and then would allocate to each municipality its fair share of the present and prospective regional need. A municipality's fair share obligation was fixed as a specific number of affordable housing units. Each municipality was assigned a proportionate fair share of the region's need for housing based on its economic projections and its capacity to accommodate affordable housing. A municipality that failed to create a realistic opportunity for satisfying its assigned fair share would leave itself vulnerable to a builder's remedy challenge, wherein a builder-plaintiff could bring suit to override a municipality's zoning autonomy and construct affordable housing.

D.

The Third Round Rules initially were promulgated in December 2004.[2] The rule proposal published in the New Jersey

---

[2] The Second Round Rules were due to expire in 1999. COAH did not adopt Third Round Rules until 2004, a delay characterized by

Register explained that a municipality's fair share for the period from 1987 through January 1, 2014, would be calculated using three criteria:

> (1) a municipality's "rehabilitation share" based on the condition of housing revealed in the data gathered for the 2000 Census, previously known as a municipality's indigenous need; (2) a municipality's unsatisfied prior round obligation (1987 through 1999), satisfaction of which will be governed by the second round rules; and (3) a municipality's "growth share" based on housing need generated by statewide job growth and residential growth from 1999 through 2014.
>
> [In re N.J.A.C. 5:94, supra, 390 N.J. Super. at 27.]

See also 36 N.J.R. 5748, 5750 (Dec. 20, 2004). The third criterion was a substantial methodological departure from that used in the prior rounds. The growth share approach -- that is, tying a municipality's affordable housing obligation to its own actual rate of growth -- became the new and central criterion for determining a municipality's future fair share obligation.

Before exploring the nature of this approach, we detail the procedural steps that preceded this Court's consideration of the

---

the Appellate Division as "dramatic," "inexplicable," and frustrating the public policies embodied by the Mount Laurel line of cases. In re Six Month Extension of N.J.A.C. 5:91 et seq., 372 N.J. Super. 61, 95-96 (App. Div. 2004), certif. denied, 182 N.J. 630 (2005).

current challenge to COAH's adoption of a growth share methodological approach.

E.

In a challenge to the initial iteration of the Third Round Rules, the Appellate Division, in a decision authored by the Honorable Mary Catherine Cuff, sustained some but rejected many of the specific challenges to the regulations. In re N.J.A.C. 5:94, supra, 390 N.J. Super. at 1. As summarized by the appellate panel that considered the present appeal:

> Judge Cuff's opinion rejected appellants' arguments that the "rehabilitation share" of a municipality's affordable housing obligation, sometimes also referred to as present need, should include "cost burdened" low- and moderate-income households that reside in standard housing and households that lack permanent housing or live in overcrowded housing; that COAH's methodology for identifying substandard housing was "arbitrary and unreasonable"; that the third round rules improperly eliminated the part of the first and second round methodologies that required reallocation of excess present need in poor urban municipalities to other municipalities in the region; that the use of regional contribution agreements to satisfy part of a municipality's affordable housing obligations violates the Mount Laurel doctrine and federal and state statutory provisions; that the allowance of bonus credits towards satisfaction of a municipality's affordable housing obligations unconstitutionally dilutes those obligations; and that the rule relating to vacant land adjustments violates the Mount Laurel doctrine and the FHA.

20

However, Judge Cuff's opinion invalidated the parts of the original third round rules that reduced statewide and regional affordable housing need based on "filtering"; adopted a growth share approach for determining a municipality's fair share of prospective needs for affordable housing and excluded job growth resulting from rehabilitation and redevelopment in determining job growth; compelled developers to construct affordable housing without any compensating benefits; authorized a municipality to give a developer the option of payment of a fee in lieu of constructing affordable housing, but provided no standards for setting those fees; and authorized a municipality to restrict up to 50% of newly constructed affordable housing to households with residents aged fifty-five or over.

[In re N.J.A.C. 5:96, supra, 416 N.J. Super. at 475-76 (citations omitted).]

Because the Appellate Division invalidated a substantial number of the nascent Third Round Rules, the matter was remanded to COAH for the adoption of revised Third Round Rules. In re N.J.A.C. 5:94, supra, 390 N.J. Super. at 86-88. COAH was twice granted extensions from its original six-month deadline and, finally, proposed revised Third Round Rules in January 2008, adopting those revised rules on June 2, 2008, without significant alteration. After a number of notices of appeal were filed, COAH proposed and subsequently adopted, on October 20, 2008, a number of amendments to the revised Third Round Rules. See N.J.A.C. 5:96-1.1 to -20.4; N.J.A.C. 5:97-1.1 to -

10.5, Appendices A to F.  The instant appeals followed from the adopted Third Round Rules.

F.

1.

In the judgment under review, the Appellate Division invalidated a substantial portion of the new regulations, including the growth share methodology used by COAH, and ultimately remanded for the promulgation of a new set of rules within five months.  In re N.J.A.C. 5:96, supra, 416 N.J. Super. at 511-12.  Although several of the parties have raised new arguments before this Court, the Appellate Division's holdings concerning the various regulations in the Third Round Rules comprise the bulk of the issues on appeal.

The panel initially addressed the validity of the newly adopted growth share model, particularly as a component of computing a municipality's affordable housing obligation.  See N.J.A.C. 5:97-2.2, -2.4, -2.5.  Under the new model, a municipality's obligation is the sum of (1) the rehabilitation share, (2) the prior round obligation, and (3) the growth share. Ibid.  The panel concluded that the growth share component is inconsistent with the Mount Laurel doctrine and expressed doubts as to whether any growth share model could survive scrutiny because a municipality's obligation should not hinge on its

22

choice of whether or not to grow.  In re N.J.A.C. 5:96, supra, 416 N.J. Super. at 483-85.  For this reason, the panel struck down as inconsistent with Mount Laurel II the growth share methodology in the Third Round Rules.  Id. at 485.

The panel next invalidated several other important provisions in the Third Round Rules.  First, the panel struck down the regulations concerning the preparation of fair share plans.  Id. at 487-88; see N.J.A.C. 5:97-3.2(a)(4)(iv).  Several parties argued that the fair share plans were overly vague, but the panel, while finding some merit to the vagueness argument, ultimately invalidated the regulation because it was wholly dependent on the growth share methodology.  In re N.J.A.C. 5:96, supra, 416 N.J. Super. at 487-88.

Second, the panel struck down the presumptive incentives embodied in the regulations.  Id. at 488-93; see N.J.A.C. 5:97-6.4.  Taking issue with the presumptive minimum densities and maximum set-aside percentages, the panel concluded that the incentives were insufficient to create a "realistic opportunity" for the development of affordable housing.  In re N.J.A.C. 5:96, supra, 416 N.J. Super. at 493.  The panel viewed the minimum densities as too low and the maximum set-asides as too high to properly incentivize developers.  Id. at 491-93.

Third, the panel invalidated the provisions concerning rental bonus credits, N.J.A.C. 5:97-3.5, and compliance credits, N.J.A.C. 5:97-3.17. In re N.J.A.C. 5:96, supra, 416 N.J. Super. at 493-95, 497-98. The panel took issue with COAH providing credits to municipalities for rental units yet to be constructed more than one decade after the prior round. Id. at 494-95. And, the panel concluded that compliance credits neither furthered public policy nor assisted municipalities in fulfilling their constitutional obligations. Id. at 497-98.

On the other hand, the Appellate Division upheld several of the regulations against party challenges. The panel concluded that it was not constitutionally prohibited to do away with reallocated present need. Id. at 500-02. Instead, the panel reasoned that COAH possessed the authority to focus on a municipality's own obligation, see N.J.A.C. 5:97-2.4, rather than reallocating excess present need away from those areas overburdened with substandard housing. In re N.J.A.C. 5:96, supra, 416 N.J. Super. at 501-02. The panel similarly dismissed a challenge that municipalities were being forced to make direct expenditures to satisfy their affordable housing obligations in contravention of N.J.S.A. 52:27D-302(h), -311(d). In re N.J.A.C. 5:96, supra, 416 N.J. Super. at 502-05. The panel concluded that incidental impacts on municipal finances do not

constitute mandated expenditures and, in any event, municipalities could petition COAH for an adjustment of their obligations. Id. at 504-05. Finally, the panel upheld COAH's decision to use the prior round obligations without updating the obligations based on actual household growth. Id. at 498-500; see N.J.A.C. 5:97, Appendix C at 97-71.

2.

As its remedy, the panel directed COAH to use methodologies consistent with the first two rounds. In re N.J.A.C. 5:96, supra, 416 N.J. Super. at 511. COAH applied for a stay from the Appellate Division, which was denied.

On December 23, 2010, COAH sought leave to apply for a stay from this Court, arguing that it should not be required to expend substantial resources formulating new rules that this Court's review might render a nullity. While that decision was pending, Fair Share Housing Center (FSHC) moved for the enforcement of litigant's rights against COAH, arguing that the agency was failing to comply with the Appellate Division's remand instructions. FSHC noted that COAH had cancelled a number of its board meetings and taken no action to comply with the Appellate Division's remand instructions. On January 13, 2011, the Appellate Division ordered COAH to comply immediately with its prior decision and to submit biweekly reports to enable

the court to monitor COAH's continuing compliance. The following day, this Court granted COAH's application for a stay of the Appellate Division opinion. Reconsideration of that decision was denied. Our Court thereafter granted the instant petitions and cross-petitions for certification. 205 N.J. 317 (2011).

## II.

### A.

Because growth share is the backbone of the regulatory scheme adopted by COAH, the regulations' validity rises or falls on whether the growth share approach adopted in the revised Third Round Rules is permissible. That core issue permeates the arguments of the parties, and the amici, in this appeal.

COAH, in its petition seeking reversal of the Appellate Division judgment, urges this Court to look favorably on allowing a new growth share methodology. In addition to its defense of the adequacy of its rulemaking record, COAH argues that the specificity of Mount Laurel II should not preclude a growth share methodology, which is an innovative and valid administrative response to current conditions in the state, notably the dearth of vacant, developable land. That scarcity makes a growth share approach particularly appealing as the methodology promotes redevelopment rather than continued sprawl.

The New Jersey State League of Municipalities (League) contends that binding COAH to the use of a nearly thirty-year-old methodology is a mistake in light of changed circumstances. Although the League finds deficiencies in the formulas utilized by COAH, it nonetheless advocates for a growth share approach as "a viable and appropriate method [for] municipalities to satisfy their constitutional obligation."

Also before the Court is a petition for certification filed by Clinton Township and ten other municipalities (collectively the Eleven Municipalities).[3] The Eleven Municipalities argue that this Court either should create a simplified growth share model as the sole means of allocating and satisfying affordable housing obligations or, alternatively, affirm that growth share is a permissible methodology and send the matter back to COAH. The Eleven Municipalities assert that the current system of implementing <u>Mount Laurel</u> obligations is unsustainable and urge this Court to consider simply assigning prospective need and obligation at ten percent of a municipality's future residential growth with certain safety valves. Insofar as the <u>Mount Laurel</u>

---

[3] The parties are:  Clinton Township; Bedminster Township; Bernards Township; Township of Bethlehem; Town of Clinton; Greenwich Township; Montgomery Township; Borough of Peapack and Gladstone; Readington Township; Borough of Roseland; Union Township, Hunterdon County; and Marvin J. Joss, a New Jersey resident.

27

<u>II</u> decision militates against its ten-percent proposal, the Eleven Municipalities would have this Court reassess that decision. Finally, the Eleven Municipalities find flaws in the formulas and data used by COAH in implementing the Third Round Rules.

Middletown Township argues that this Court should overturn or reassess <u>Mount Laurel II</u>. Additionally, Middletown argues that COAH should provide a safety valve to help overburdened municipalities comply with their large affordable housing obligations.

FSHC petitions this Court to alter the remedy -- a remand to COAH -- entered by the Appellate Division. At the core of its argument, FSHC maintains that any growth share approach is inconsistent with the <u>Mount Laurel</u> constitutional obligation as implemented by this Court and in the FHA. FSHC urges the Court to "appoint a special master, require bi-monthly reporting by COAH, require the special master to calculate the need numbers according to the Appellate Division's requirements if COAH does not act, and accelerate any appeals from the regulations that are adopted." FSHC asks this Court to make clear that if COAH is unable to adopt valid regulations by some date certain, the Court should reassume exclusive responsibility for administering and enforcing the <u>Mount Laurel</u> doctrine.

Finally, several briefs in opposition to certification were filed, which supported the Appellate Division's rejection of COAH's new growth share approach.  The New Jersey Builders Association, the New Jersey Chapter of the National Association of Industrial and Office Properties, MTAE, Inc., and Kenneth and Alice Martin each contend that the Appellate Division opinion is a direct application of existing precedent and is consistent with this Court's statements in Mount Laurel II.  Further, numerous amici[4] ask this Court to affirm the Appellate Division's decision and to impose the same remedy:  a remand to COAH with direction to use a methodology similar to that used in the prior rounds.

With that lineup of positions, we turn to examine the key concept of growth share.

B.

---

[4] The following amici curiae participated in this appeal:  The Corporation for Supportive Housing and Supportive Housing Association of New Jersey; New Jersey Future, American Planning Association, American Planning Association-New Jersey Chapter, and the Housing & Community Development Network of New Jersey; New Jersey State Conference of the National Association for the Advancement of Colored People and Latino Action Network; The International Council of Shopping Centers; Pennsauken Township and Township of Montclair; American Civil Liberties Union of New Jersey Foundation; Catholic Charities, Diocese of Camden, Inc., Catholic Charities, Diocese of Metuchen, Catholic Charities, Diocese of Paterson, and Catholic Charities, Diocese of Trenton; Legal Services of New Jersey.

In 1997, the concept of "growth share" was advocated[5] as an alternative approach to the methodologies used in the First and Second Round Rules. See generally John M. Payne, Remedies for Affordable Housing: From Fair Share to Growth Share, Land Use L. & Zoning Dig., June 1997, at 3, 3. Under a growth share methodology, a municipality's constitutional obligation "would be a simple . . . allocat[ion of] a share of whatever growth actually occurs to low- and moderate-income housing." Id. at 6 (emphasis in original). According to Professor Payne, growth share needed to capture both residential and nonresidential growth,[6] as well as new development and redevelopment. Ibid. Municipalities would meet their obligations by "requir[ing] an inclusionary Mount Laurel component in any large-scale developments as they are approved" and by collecting development fees from smaller developments that would be used to subsidize affordable housing elsewhere. Id. at 7 (citing Holmdel Builder's Ass'n v. Twp. of Holmdel, 121 N.J. 550, 576, 585 (1990) (authorizing development fees, explaining that they are

---

[5] The late Professor John Payne of Rutgers School of Law – Newark, who advocated for the affordable housing remedies imposed by the Court in Mount Laurel II, advanced the concept of growth share.

[6] In a hypothetical, Professor Payne suggested that twenty-five percent of market-rate growth should be allocated to affordable housing. Id. at 7 & n.3. That is a 4:1 ratio, the same as that selected by COAH in its revised Third Round Rules.

"functional[ly] equivalent [to] mandatory set-aside schemes authorized by Mount Laurel II and the FHA")). Subsidies and regulation of the private market also would supplement those approaches. Id. at 8.

Professor Payne reasoned:

> By tracking growth, rather than trying to predict it through an impossibly inaccurate formula, growth share solves many of the problems of the present fair share formula. By definition, it measures the capacity of the private sector to meet part of the need for low- and moderate-income housing, because it is an objective measure of what economic activity actually takes place. Moreover, by allocating fair share obligations after presumptively sound planning decisions have been made by responsible public officials, Mount Laurel compliance would proceed in a much healthier political environment.
>
> [Id. at 7.]

Thus, as proposed, a growth share approach was envisioned as a straightforward allocation method where a municipality would accrue affordable housing obligations as a percentage of the residential and nonresidential growth that occurred within its borders. See id. at 6-7.

When COAH adopted its first iteration of the Third Round Rules in 2004, see generally N.J.A.C. 5:94 to 5:95, the agency included the growth share approach as the sole method for calculating a municipality's prospective affordable housing

31

obligation.  See N.J.A.C. 5:94-2.4, -2.5.  That set of
regulations, however, also continued to hold a municipality
responsible for its rehabilitation share and its prior round
obligations.  N.J.A.C. 5:94-1.2.

According to the regulations adopted by COAH, a
municipality would accrue an obligation to construct one unit of
affordable housing for every eight market-rate units constructed
and one unit of affordable housing for every twenty-five jobs
created.  N.J.A.C. 5:94-2.4.  Job growth was calculated by
applying a conversion factor to the gross square footage of
nonresidential development constructed.  N.J.A.C. 5:94, Appendix
E at 94-86.  The 8:1 and 25:1 growth share ratios were selected
by COAH so that affordable housing construction would match
adjusted projected need.[7]  Ibid.

After the Appellate Division required COAH to adopt new
regulations,[8] the agency revised the Third Round Rules.  Under

---

[7] Adjusted projected need was calculated by adjusting the total
projected need based on various secondary sources, including
demolitions, filtering, residential conversion, and publicly
assisted housing creation.  N.J.A.C. 5:94, Appendix A at 94-46.

[8] When those rules were initially challenged, Judge Cuff found
that COAH had not shown that sufficient vacant developable land
existed in each region such that the growth share ratios would
generate sufficient housing to meet the regional need.  In re
N.J.A.C. 5:94, supra, 390 N.J. Super. at 52-54.  In addition,
the panel observed that COAH's growth share approach placed no
check on municipalities to prevent them from adopting zoning

the Third Round Rules, municipalities accrue growth share obligations at the rate of one unit of affordable housing for every four new residential units and one unit of affordable housing for every sixteen newly created jobs.  N.J.A.C. 5:97-2.2(d), -2.4; N.J.A.C. 5:97, Appendix D.  Those ratios were formulated by estimating the state's projected overall affordable housing need, estimating the projected employment and residential growth in the state, and then calculating how many units of affordable housing per each projected new job and housing unit would be necessary to meet the state's affordable housing need.  See N.J.A.C. 5:97, Appendix A at 97-48.5 to -48.6.  As counsel for COAH confirmed at oral argument before this Court, the calculation of affordable housing need did not include region-specific data.  Thus, the ratios used in the growth share methodology have homogenized the state's need for affordable housing and have failed to reflect the specific needs for low- and moderate-incoming housing in different regions of our state.

---

regulations that would retard growth.  Id. at 55-56.  The panel remanded the case to COAH to adopt new rules within six months. Id. at 88.  The agency ultimately issued the revised Third Round Rules in June 2008.

Specifically, COAH projected a total need of 131,297 units,[9] a figure which was reduced by 15,631 units to account for secondary sources of supply, including filtering, residential conversion, and demolitions. Id. at 97-48.5, -51 to -53. Thus, COAH calculated an adjusted projected statewide need for affordable housing of 115,666 units. Id. at 97-51, -53. COAH utilized data showing housing unit growth would be 314,069[10] and job growth would be 791,465 for the relevant time period. Id. at 97-48.5, -55. After assigning fifty-seven percent of the projected affordable housing need to projected housing unit growth, and forty-three percent of the projected affordable housing need to projected employment growth, COAH determined that the ratios of one affordable housing unit for four market-

[9] Total need for low- and moderate-income affordable housing was ascertained by determining the additional need for low- and moderate-income households in 2018 as compared to 1999. N.J.A.C. 5:97, Appendix A at 97-48.5 to -51. That figure was primarily based on the estimate of additional housing units that would exist in 2018 -- 377,190 -- and the assumption that the number of low- and moderate-income households would remain constant at 37.7 percent. Id. at 97-45 to -49. However, those figures were adjusted to compensate for vacant housing units, persons with low incomes who had substantial assets and had paid off their mortgages, and persons living in group quarters. Id. at 97-49 to -51.

[10] This figure adds together the projected number of additional housing units (for 2018 as compared to 2004) and the projected number of replacement units, and then subtracts from that total the units necessary to deliver prior round obligations to avoid double counting. N.J.A.C. 5:97, Appendix A at 97-48.5, -54 to -55.

34

rate housing units produced and one affordable housing unit for every sixteen jobs created would produce the necessary affordable housing.  Id. at 97-48.5, -55.

With those ratios, COAH calculated each municipality's projected growth share obligation by predicting household and employment growth for each municipality based on the "historical trends for each municipality and the extent to which each municipality approaches its physical growth capacity."  N.J.A.C. 5:97-2.2(d); see also N.J.A.C. 5:97, Appendix F (displaying household and employment projections).

Although COAH initially calculates a municipality's projected growth share obligation, as the Appellate Division decision by Judge Skillman rightly notes, a municipality only incurs growth share obligations to the extent that growth actually occurs.[11]  See N.J.A.C. 5:97-2.2(e) ("Affordable housing shall be provided in direct proportion to the growth share obligation generated by the actual growth.");  N.J.A.C. 5:97,

_____

[11] Despite regulatory statements suggesting the contrary, see N.J.A.C. 5:97-2.2(e) (stating that if actual growth is less than projected growth, municipalities must still "continue to provide a realistic opportunity for affordable housing to plan for the projected growth share through inclusionary zoning or any of the mechanisms permitted by N.J.A.C. 5:97-6"); N.J.A.C. 5:97-2.5(e) (using nearly identical language), COAH confirmed at oral argument that the regulations intended to hold municipalities responsible for creating affordable housing units consistent with only their actual growth.

Appendix A at 97-56 ("In sum, municipalities incur obligations to provide affordable housing only when and to the extent growth occurs.  Each municipality's current round affordable housing obligation is based on <u>actual</u> growth . . . ."(emphasis in original)).  COAH's biennial review process ensures that projected growth share obligations are replaced with obligations that are "in proportion to the actual residential growth and employment growth in the municipality."  <u>N.J.A.C.</u> 5:96-10.1(a); <u>see also</u> 40 <u>N.J.R.</u> 5965(a), 5994 (Oct. 20, 2008) ("The projection of growth share is to be used as a planning tool to establish reasonable targets. . . .  The actual obligation will be determined based upon what actually occurs and adjustments will be made during biennial plan reviews.").  Thus, even if a municipality were allocated a large projected growth share obligation, if growth fell below that rate, its actual growth share obligation would be reduced to reflect that slowed residential and job growth.[12]  That result is facially inconsistent with the FHA's command to COAH to develop criteria establishing municipal determinations of present and prospective fair share of housing that results in firm, fair share

---

[12] By contrast, a municipality that grew more than projected would incur an obligation for more affordable housing than originally projected based on its substantial growth.

allocations, see N.J.S.A. 52:27D-307, against which the municipality's housing element may be designed, N.J.S.A. 52:27D-310, and reviewed for substantive certification purposes, N.J.S.A. 52:27D-313, -314. It is also at odds with the remedy adopted in Mount Laurel II, which imposed definitive quantitative obligations to be fulfilled within fixed periods.

C.

1.

With respect to the Mount Laurel II remedy, we felt obliged in view of the municipal inertia toward allowing affordable housing, through exclusionary zoning practices, to compel the building of units in anticipation of projected regional need as well as present need. Mount Laurel II, supra, 92 N.J. at 243-44. We conceived of the prospective regional need for affordable housing as an ascertainable figure to be calculated prior to determining specific municipal obligations. Id. at 248. The growth share approach in COAH's Third Round Rules is not premised on region-specific housing data evidencing the region's need. See supra at ___ (slip op. at 31-34). Nor is growth share as presently adopted structured to establish a firm obligation in respect of prospective affordable housing need. See supra at ___ (slip op. at 34-36). In those respects, the methodology is inconsistent with the remedy that we crafted in

Mount Laurel II, but our analysis cannot, and does not, end
there.

2.

As argued in this matter, the present approach has been
criticized as having produced a labyrinth of administrative
processes, which has led to stagnation in defining municipal
obligations, as having failed to reduce litigation, and as
having promoted turmoil instead of certainty in planning.
Further, parties contend that it has led to unwarranted
hostility toward inclusionary zoning.

More than thirty years have passed since this Court
outlined a framework through which municipalities could satisfy
their obligation to provide a fair share of the regional
prospective need for affordable housing in Mount Laurel II.  We
now have decades of data on the creation of affordable housing
in New Jersey.  The present approach has had demonstrable
success at producing affordable housing.  Although estimates
vary depending on the source, approximately 36,000 to 60,000 new
low- and moderate-income units have been developed between 1985
and 2010.  Compare David N. Kinsey, Smart Growth, Housing Needs,
and the Future of the Mount Laurel Doctrine, in Mount Laurel II
at 25: The Unfinished Agenda of Fair Share Housing 57 (Timothy
N. Castano & Dale Sattin eds., 2008) [hereinafter The Unfinished

Agenda] (relying on COAH records), with N.J. Housing Opportunity Task Force, Findings & Recommendations 2 (2010) [hereinafter Taskforce Findings & Recommendations].  Additionally, approximately 15,000 substandard units have been refurbished, and $210 million has been generated "from suburban sources to apply to urban housing."  Preface, The Unfinished Agenda, supra, at 1.

We also have data on general trends in population size and the production of housing units.  The statewide population and number of housing units have steadily increased from the 1980s.  According to the United States Census Bureau's 2010 Census, the New Jersey population increased from 7.37 million to 8.79 million over the last thirty years -- a nineteen percent increase from 1980 to 2010.  See U.S. Census Bureau, New Jersey: 2010, Population and Housing Unit Counts at Table 4 (Aug. 2012), available at http://www.census.gov/prod/cen2010/cph-2-32.pdf.  And, the number of housing units increased from 2.77 million to 3.55 million -- a twenty-eight percent increase in the same time period.  See ibid.  These data reveal that housing has been developed at a quicker pace than population growth in New Jersey.

Moreover, experts in the field have analyzed housing development trends in urban and rural areas.  In 1992, the State

Planning Commission introduced the State Development and Redevelopment Plan (State Plan), which "prescribed patterns of development and conservation . . . with precise mapping." See Kinsey, Smart Growth, in The Unfinished Agenda, supra, at 48. The State Plan categorized different types of planning areas: "metropolitan, suburban, fringe, rural, and environmentally sensitive planning areas, [each] with different delineation criteria and policies." Ibid. Despite the different planning categories and the implementation of affordable housing regulations, "about 40 percent of new growth [between 1995 and 2002] took place in the State Plan's rural and environmentally sensitive planning areas, rather than being channeled into growth areas and centers." Id. at 49.[13]

Transportation patterns also have changed significantly since the 1980s. In 1980, the average daily commute was approximately twenty minutes, while today the average commute has grown to thirty-two minutes, indicating New Jerseyans'

---

[13] Since this Court's Mount Laurel I decision, the Legislature has enacted a variety of environmental statutes, including the Pinelands Protection Act, N.J.S.A. 13:18A-1 to -58, the Right to Farm Act, N.J.S.A. 4:1C-1 to -10.4, the Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30, the Garden State Preservation Trust Act, N.J.S.A. 13:8C-1 to -42, and the Highlands Water Protection and Planning Act, N.J.S.A. 13:20-1 to -35. See Taskforce Findings & Recommendations, supra, at 5. These statutes, taken collectively, invariably have influenced new home development.

willingness to travel farther from home for work.  See Taskforce Findings & Recommendations, supra, at 3.  Finally, a number of significant road projects have been completed since the 1970s: Interstate 280, Interstate 195, and Interstate 287.  Id. at 5.

Moreover, external economic factors have influenced the development of housing in New Jersey.  The economic collapse of 2008 has had a significant impact on home prices, with home prices in New Jersey falling by "10 to 20 percent, sometimes even 25" percent in 2009.  Antoinette Martin, A Market Going Downhill Fast, N.Y. Times, Feb. 22, 2009, at NJ1.

When we issued our decision in Mount Laurel II, we could not have predicted the precise economic and social changes of the last three decades.

3.

Knowing now the changes wrought over the past three decades, we are compelled to acknowledge that there may well be other effective remedies that would promote inclusionary zoning at the local level, consistent with business and residential objectives, as well as statewide sound-planning objectives, which take into account industrial development, transportation and infrastructure availability, and environmental considerations.  Certainly, the methodology of the prior rounds is a proven method of creating a substantial amount of

41

affordable housing, and growth share is an untested approach that assumes municipalities will not utilize their discretion to undercut the production of affordable housing.  That is not to say that another approach could not do as well or better.  We do not know.  A growth share approach, for example, might prove to be successful in addressing prospective need, and it might bring greater transparency to the process and engender a more favorable climate for the creation of affordable housing.  Those positives are not to be undervalued.

Although the judicial remedy of Mount Laurel II, as adopted in the FHA, addressed the circumstances of the times, it is not necessarily the only remedy possible for achieving satisfaction of a municipality's constitutional obligations for prospective need.  We do not view our pronouncement -- that the remedy set forth by this Court and embraced in the FHA was constitutionally acceptable -- as enshrining that particular approach as the be-all-and-end-all of remedies for the future.  See, e.g., Mount Laurel II, supra, 92 N.J. at 352 (explaining that when legislative action is taken, "we have always preferred legislative to judicial action in this field").  Despite the decisional focus at that time on assessing a definite allotment of prospective regional need that must be produced within a specific time, we did not know then how that would practically

42

unfold.  Having lived with the present methodology for decades now, the record suggests that there might be reasonable bases for considering alternative approaches to promote the production of affordable housing consistent with present statewide-planning and other principles previously identified.

And, just as words matter, numbers matter too.  Applying a growth share approach, for example, might have produced over the past thirty years roughly the same number of affordable housing units that the present allocation method has produced.[14] Although a growth share approach might not have produced units in the same regions or municipalities where they occurred, we

---

[14] Although the exact numbers are in some dispute, a recent COAH document, based on a compilation of the information provided by municipalities, states that 60,242 new affordable housing units have been created, and 14,854 affordable housing units have been rehabilitated statewide.  COAH, Proposed and Completed Affordable Units 11 (Mar. 1, 2011), available at http://www.state.nj.us/dca/services/lps/hss/transinfo/reports/units.pdf.  The numbers are not staggering and might well have come into being based on the sheer amount of development that this state experienced during the same period of time.  Additionally, tens of thousands affordable new and rehabilitated units have been planned, but not yet constructed.  See ibid.  On the other hand, there is evidence from other jurisdictions that growth-share-type approaches have proven successful at creating affordable housing.  See N.J.A.C. 5:97, Appendix F at 97-223 to -228.  We recognize, however, that none of those programs are directly comparable; most are mandatory residential set-aside requirements that have less ambitious affordable housing ratios and a narrower scope than COAH's growth share rules.  See ibid.

cannot say that it is anathema to consider some form of such an approach adjusted for present-day building realities.

To be sure, deterring exclusionary municipal zoning practices and concomitantly encouraging development of affordable housing in housing regions where it is needed were the goals of the obligation recognized under the General Welfare Clause of the New Jersey Constitution. See Mount Laurel II, supra, 92 N.J. at 352 (concluding that constitutional obligation requires municipalities "to provide a realistic opportunity for housing" for low- and moderate-income persons in our state). How to respond to the constitutional obligation imposed on municipalities in the exercise of their delegated power to zone is a separate question, and one that might be adequately addressed in different ways tailored to today's circumstances. See supra at ___ (slip op. at 8-12). We therefore recognize, and hold, that the constitutional obligation identified in Mount Laurel I and refined and made applicable to all municipalities in Mount Laurel II is distinct from the judicial remedy that this Court embraced.

Development merely for development's sake is not the constitutional goal. Mount Laurel II, supra, 92 N.J. at 238 ("The Constitution of the State of New Jersey does not require bad planning. It does not require suburban spread. It does not

44

require rural municipalities to encourage large scale housing developments."); id. at 211 ("But if sound planning of an area allows the rich and middle class to live there, it must also realistically and practically allow the poor.  And if the area will accommodate factories, it must also find space for workers.  The specific location of such housing will of course continue to depend on sound municipal land use planning.").  Nor are all aspects to the remedy fashioned in Mount Laurel II indispensable components of a remedy for the future.  One can envision alternative approaches that, perhaps, might relegate a builder's remedy to a more reserved status among available solutions to encouragement of construction of affordable housing, reducing the political turmoil that has plagued voluntary compliance with the constitutional goal of advancing the delivery of affordable housing.  See Payne, supra, Land Use L. & Zoning Dig., June 1997, at 6.

Other aspects to the judicial remedy might benefit from re-examination.  For example, our remedy's utilization of a pre-fixed allocation of municipal obligations based on forecasted projected growth has been criticized for the crudeness inherent whenever one presumes to anticipate development cycles.  Id. at 6-7.  We do not pretend to know what form or forms of alternative remedies might be devised that would suitably

further the constitutional goal of addressing the prospective need for affordable housing. But, that should not prevent policymakers from considering the benefits of an alternate remedy that accounts for current economic conditions, the building that has occurred already in this state, the present-day space availability and redevelopment options, and the wisdom of requiring building in all municipalities of the state within fixed periods. Those are questions for policymakers -- should our Legislature choose to address the topic.

Certainly, tools must remain in place to deal with those municipalities that would affirmatively choose not to grow -- either commercially or residentially -- in order to avoid having any inclusionary zoning obligation. Mandated requirements for the production of definite numbers of affordable housing units may prove to be the only way to address those municipalities that heretofore have avoided their affordable housing obligations.[15] But, the record before this Court did not include

---

[15] Indeed, under a "pure" growth share approach as originally espoused by Professor Payne, the methodology appears to entirely forgive municipalities their prior round obligations, thus rewarding those municipalities that have managed to evade the COAH process through delay or other bad faith tactics. See Payne, supra, Land Use L. & Zoning Dig., June 1997, at 6-9. Furthermore, it would permit a municipality to remain wholly exclusionary by choosing not to grow. Id. at 9.

A pure growth share approach has its flaws, which some have suggested potentially could be of constitutional dimension. See

evidence or data that such municipal action would take place,
and we are wont to agree with those that assert that
circumstances of such utter recalcitrance are not common at
present.  Nor do we believe that we should presume the worst and
deal with that worst-case scenario as if all municipalities
would act similarly.  To be sure, our courts will enforce the
constitutional obligation if evidence is presented to us of
municipalities zoning in exclusion of the general welfare of the
citizens of our state.  See N.J. Const. art. I, ¶ 1.

In sum, the judicial remedy that was fashioned based on a
record created thirty years ago should not be viewed as the only
one that presently can secure satisfaction of the constitutional
obligation to curb exclusionary zoning and promote the
development of affordable housing in the housing regions of this
state.  Assuming that ordered development will continue to be
used as a tool in the delivery of affordable housing, the
Legislature should determine how best to utilize that means in

---

John M. Payne, The Unfinished Business of Mount Laurel II, in
The Unfinished Agenda, supra, at 5-19.  In contrast, the revised
Third Round Rules are a hybrid approach, based on actual growth,
with both residential and nonresidential components.  The rules
constitute a hybrid methodology because they continue to hold
municipalities responsible for their rehabilitation share and
for prior round obligations.

the promotion of affordable housing suited for the needs of housing regions.

D.

In light of our clarification that the judicial remedy imposed in Mount Laurel II is not a straightjacket to legislative innovation for satisfaction of the constitutional obligation, the Third Round Rules' validity hinges on whether they are consistent with the FHA.

The FHA sets forth the framework of a remedy that precludes COAH from taking the liberty to fashion a new growth share methodology that 1) allows for the devising of residential and commercial affordable housing ratios for projected need that are not tied to a regional need for affordable housing, and 2) leaves open-ended how or whether projected need for a housing region will be fulfilled.  The FHA is replete with references tying affordable housing obligations to a region, not obligations formed on a statewide basis.  And, it requires a specifically allotted number of units for satisfaction of both present and prospective need based on a housing region.

The FHA defines "prospective need" as "based on development and growth which is reasonably likely to occur in a region or a municipality."  N.J.S.A. 52:27D-304(j) (emphasis added).  A "housing region" is specifically defined as "a geographic area

48

of not less than two nor more than four contiguous, whole counties which exhibit significant social, economic and income similarities." N.J.S.A. 52:27D-304(b). It is not a statewide, geographic area.

The Legislature also declared that "low income housing" must be provided to those households meeting the low-income standard "within the housing region." N.J.S.A. 52:27D-304(c). Although COAH has broad power under N.J.S.A. 52:27D-307, its duties must be consistent with the FHA's working premise that affordable housing obligations for present and prospective need for low- and moderate-income housing be determined at regional levels. See N.J.S.A. 52:27D-307(a) (requiring COAH to "[d]etermine housing regions"), (b) (requiring COAH to "[e]stimate the present and prospective need" at both "State and regional levels"), and (c) (authorizing COAH to establish criteria and guidelines for municipalities tethered to regional housing need).

Furthermore, even when COAH is placing an aggregate limit on a municipality's allocation of units, a distinct allocation nevertheless is to be made based on the housing "region's present and prospective need." N.J.S.A. 52:27D-307(e). A municipality's provision of its fair share, as presented in its housing element, may involve a variety of techniques, but there

49

must be demonstrated a realistic opportunity for providing affordable housing within the municipality. N.J.S.A. 52:27D-311(a). The housing element is reviewed under that same standard, see N.J.S.A. 52:27D-313, and the municipality's achievement of substantive certification can only come from having a fair share plan "not inconsistent with achievement of the low and moderate income housing needs of the region," N.J.S.A. 52:27D-314(a).

Although Section 307 of the FHA permits COAH to adjust prospective need methodology and resulting estimations based on, among other things, decisions of other branches of government, we disagree that Section 307's oblique reference authorizes COAH, as an executive branch agency, to rewrite such core aspects of its enabling legislation, which are premised on an allocation basis for prospective need within a housing region. That argument is misguided. It defies the express language of Section 307, which requires the State Planning Commission to continue to provide updated information on "economic growth, development and decline projections for each housing region." N.J.S.A. 52:27D-307; see N.J. Dep't Envtl. Prot. v. Huber, 213 N.J. 338, 365 (2013) (explaining that "we must examine th[e statute's plain] language sensibly, in the context of the overall scheme in which the Legislature intended the provision

to operate" (citation omitted)).  Such an unprecedented, open-ended delegation of authority to an administrative agency is an illogical application of Section 307's language.

This Court has recognized that, while COAH enjoys a breadth of discretion when selecting methodologies to implement the FHA, the agency may not dilute its duty to adopt regulatory methods that are consistent with statutory goals.  See Warren, supra, 132 N.J. at 27 (citing Van Dalen, supra, 120 N.J. at 246).  COAH must not, "under the guise of interpretation," enact regulations that are "plainly at odds with" the FHA.  In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 489-91 (2004) (internal quotation marks and citation omitted) (invalidating Department of Environmental Protection regulations concerning construction near wetlands transition areas as inconsistent with enabling statute and ultra vires); see also, e.g., Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 529-30 (1964) (invalidating Division of Taxation regulation defining "immediate family" as inconsistent with enabling statute, noting that "if the regulation attempts to add to the statute something which is not there, it can furnish no sustenance to the statute"); In re Centex Homes, LLC, 411 N.J. Super. 244, 252, 267-68 (App. Div. 2009) (invalidating Board of Public Utilities regulations governing service extensions, noting that "when regulations are

promulgated without explicit legislative authority and implicate 'important policy questions,' they are better off decided by the Legislature" (quoting Borough of Avalon v. N.J. Dep't of Envtl. Prot., 403 N.J. Super. 590, 607 (App. Div. 2008), certif. denied, 199 N.J. 133 (2009), and citing Burlington Cnty. Evergreen Park Mental Hosp. v. Cooper, 56 N.J. 579, 598-99 (1970)).  The policy adopted by the Legislature in the FHA cannot be ignored or rewritten by COAH to the degree that COAH has done through its wholly new growth share methodology in the Third Round Rules.

The FHA set a course that tracked the Mount Laurel II allocation methodology for satisfaction of present and prospective need based on housing region.  COAH was not free to abandon that approach.  Nor are we free to ignore the legislative choice.[16]  The FHA embodies the remedial approach

---

[16] To the extent that the dissent maintains that the Third Round Rules' failure to address regional need is permissible under the FHA, such an interpretation runs afoul of the FHA's express references to regional housing need as the linchpin for calculating municipal obligations.  The FHA, which the dissent agrees codified the Mount Laurel decisions, is replete with examples of how sound planning principles must be employed contingent on a municipality satisfying its fair share of a region's need for low- and moderate-income housing.  See supra at ___ (slip op. at 48-49).  Indeed, the legislative findings highlight the FHA's regional approach as the Legislature's choice.  See N.J.S.A. 52:27D-302(e) (permitting municipalities to "adopt appropriate phasing schedules for meeting their fair share, so long as the municipalities permit a timely achievement

applicable in this state at this time.  See Warren, supra, 132 N.J. at 28 (explaining that where regulation is contrary to legislative policies underlying agency's implementing statute or where regulation "does not comport with [the statute's] central purpose," it will be invalidated); Toll Bros., supra, 173 N.J. at 572-73) (explaining that although it is preferred to harmonize judicial action with COAH's regulatory determinations, "that deference was not intended to 'dilute COAH's duty to adopt regulatory methods that are consistent with the statutory goals'" (quoting Warren, supra, 132 N.J. at 27-28)).

To sum up, the Legislature has to enact an alternative remedy -- such as some version of the one proposed by COAH in the Third Round Rules -- in order for that remedy to be statutorily permissible.  The FHA's language is an impediment to COAH's unilateral decision to devise a wholly new approach to determining fair share.  COAH may implement the FHA's scheme, not come up with a wholly new one.  See ibid.  The FHA does not authorize COAH to rewrite its substantive provisions.  That power was not conferred through the FHA's inclusion of provisions containing vague references about COAH's general authority to implement the FHA.

---

of an appropriate fair share of the regional need for low and moderate income housing").

53

The Legislature may determine to authorize new avenues for addressing regional need and the promotion of affordable housing. And, it may do so in ways that we do not attempt to circumscribe in this opinion because we do not know the breadth of considerations that may be brought forth through informational legislative hearings on the subject. Nevertheless, it is the Legislature that must devise the parameters to such an approach. It must craft new legislation if that is the course it wishes to take. Our courts can and should exercise caution and defer to such solutions when appropriately drafted by the Legislature. See N.J. Ass'n on Correction v. Lan, 80 N.J. 199, 220 (1979) (acknowledging importance of deference to legislative enactments addressing general welfare (citation omitted)); Roe v. Kervick, 42 N.J. 191, 230 (1964) (recognizing value of deference when reasonable minds could differ and issue to be remedied "involves a concept which varies with the needs of the times").

Although the Legislature may consider enacting an alternative form of remedy for the promotion of affordable housing in the housing regions of this state, see Hills, supra, 103 N.J. at 65 ("No one should assume that our exercise of comity today signals a weakening of our resolve to enforce the constitutional rights of New Jersey's lower income citizens.

The constitutional obligation has not changed; the judiciary's ultimate duty to enforce it has not changed; our determination to perform that duty has not changed."), enforcement of the constitutional obligation is still a matter that may be brought to the courts.

III.

A.

With the declaration that the growth share methodology is inconsistent with the FHA and thus COAH's regulations ultra vires, we briefly address the other numerous challenges to the Third Round Rules in this consolidated appeal. The challenges share a common theme of expressing various views on the growth share methodology on which municipal obligations would be based in the third round. In our view, the Third Round Rules are inextricably linked to the new growth share methodology that is incompatible with current FHA requirements. The growth share pillar to the Third Round Rules' allocation of municipal obligations is not severable, notwithstanding the severability clause contained in the regulations at N.J.A.C. 5:97-1.3. See Affiliated Distillers Brands Corp. v. Sills, 60 N.J. 342, 345 (1972) ("Severability is a question of legislative intent. That intent must be determined on the basis of whether the objectionable feature of the statute can be excised without

55

substantial impairment of the principal object of the statute.").

For example, the procedural rules, in subchapters (2) and (3) of N.J.A.C. 5:96, which describe the filing requirements for a municipality's housing element and Fair Share Plan, and the subsequent, substantive certification that a municipality can seek from COAH, have inherent in them satisfaction of prior round, rehabilitation share, and growth share obligations. They cannot stand as adopted. Similarly, the enforcement provisions of subchapter (10) of N.J.A.C. 5:96, as well as the monitoring provisions of subchapter (11), become impractical because those agency powers are tied to evaluation and satisfaction of affordable obligations, including those obtained via growth share. See N.J.A.C. 5:96-10.4(a).

Equally, the substantive regulations codified in N.J.A.C. 5:97 are tied to municipalities' housing element plans. See N.J.A.C. 5:97-2.0 to -2.5. Subchapter 3 also is replete with explanations of how, among other things, a fair share plan, N.J.A.C. 5:97-3.2, a rental housing requirement, N.J.A.C. 5:97-3.4, rental bonuses, N.J.A.C. 5:97-3.5, -3.6, and -3.7, and other bonuses operate in conjunction with growth share, see, e.g., N.J.A.C. 5:97-3.20 (discussing cap on bonus credits as percentage of projected growth share obligation). Subsection 5

has similar difficulty surviving.  See N.J.A.C. 5:97-5.6 (allowing municipality to petition for adjustment of projections underlying growth share), -5.7 (addressing potential growth share opportunities and is intertwined with -5.6), and -5.8 (setting 1000 unit cap on growth share).

Thus, the growth share methodology's intertwinement with the entire regulatory program is inseparable from the new regulatory scheme fashioned by COAH for municipal third-round obligations and how they may be satisfied because it is so pervasively woven into the entire regulatory program that it cannot be surgically removed.  See Wash. Nat'l Ins. Co. v. Bd. of Review of N.J. Unemployment Comp. Comm'n, 1 N.J. 545, 556 (1949) ("[T]here must be such manifest independence of the parts as to clearly indicate a legislative intention that the constitutional insufficiency of the one part would not render the remainder inoperative.").  It requires that the regulations be invalidated and new regulations for the third round be adopted.  Because we hold today that a growth share approach is incompatible with the FHA, we need not delve further into the differences among the challengers' arguments about growth share as presented in their petitions.

Concerning some parties' argument before this Court that subchapter 6 (zoning for inclusionary developments), does not

appear tied to a growth share approach, we conclude that such an argument sounds in policy. As such, it is better advanced to the policymakers: either to the Legislature, which may choose to take up the question of whether to allow a new growth share methodology, or to the agency that must adopt new regulations to fill the void created by invalidation of the current Third Round Rules. Rule adoption is not the role of this Court.[17]

With respect to the remainder of the Appellate Division's pronouncements on the invalidity of the Third Round Rules under the FHA, we substantially affirm its judgment with the notable exception of its invalidation of the provision addressing compliance bonus credits in N.J.A.C. 5:97-3.17. As to that provision, we express no opinion as to whether the agency's choice was so wide of the mark as to its assessment of what is necessary to promote compliance. Because the rules require that they be redone, in toto, we reserve judgment on what COAH may choose to do in its revamped rules and will review those judgments on the record then presented if the agency's choice is

---

[17] Some parties advanced policy arguments before this Court as to how new regulatory provisions should provide for a safety valve for inclusionary municipalities (advanced by Middletown Township for the first time before this Court), and seeking endorsement of a different version of growth share (advanced by the Eleven Municipalities for the first time before this Court). Those arguments are best advanced in the legislative arena.

challenged.  For now, we express no opinion on the Appellate

Division's assessment of that issue.

Our conclusion requires a new adoption of regulations to

govern the third round municipal obligations consistent with the

strictures of the FHA.

B.

Rules to govern the third round cannot wait further while

time is lost during legislative deliberations on a new

affordable housing approach.  A remedy must be put in place to

eliminate the limbo in which municipalities, New Jersey

citizens, developers, and affordable housing interest groups

have lived for too long.  Accordingly, we endorse the Appellate

Division's quick deadline for reimposing third-round obligations

based on the previous rounds' method of allocating fair share

obligations among municipalities.[18]  To the extent that this

---

[18] A note on the dissent.  The dissent mischaracterizes the remedy imposed today to fill the void created by rejection of the current Third Round Rules, which we hold are ultra vires under the FHA.  The remedy is not "drastic" or "an overhaul." See post at __, __ (slip op. at 13, 19).  In fact, the remedy is the remedial formula adopted by COAH, consistent with the FHA, and one even COAH agrees can be implemented quickly.  See post at __ (slip op. at 19).

To reiterate, the FHA remains the current framework under which COAH must operate.  The Legislature may review and amend the FHA if it so desires.  Further, to the extent that the dissent forecasts a gloomy reaction to potential legislative change, post at __ (slip op. at 18), this Court is not in the business of such speculation.

record reveals that most interested parties do not wish for that method to last for long, the remedy we impose today will incentivize prompt legislative attention to this subject.

## IV.

In conclusion, the Third Round Rules cannot stand.  They are plainly at odds with the FHA, which incorporated the Mount Laurel II remedy.  Although our decision today signals that our remedy imposed thirty years ago should not be viewed as a constitutional straightjacket to legislative innovation of a new remedy responsive to the constitutional obligation, the FHA remains the current framework controlling COAH's actions.  With respect to the current version of the FHA, the Third Round Rules are ultra vires.  We endorse the remedy imposed by the Appellate Division.

As modified by this opinion, the judgment of the Appellate Division is affirmed.

JUSTICE ALBIN and JUDGE RODRIGUEZ (temporarily assigned) join in JUSTICE LaVecchia'S opinion.  JUSTICE HOENS filed a separate, dissenting opinion, in which JUSTICE PATTERSON joins. CHIEF JUSTICE RABNER and JUDGE CUFF (temporarily assigned) did not participate.

IN THE MATTER OF THE ADOPTION
OF N.J.A.C. 5:96 AND 5:97 BY
THE NEW JERSEY COUNCIL ON
AFFORDABLE HOUSING.


          JUSTICE HOENS, dissenting.

     There is much in the opinion issued by my colleagues in the majority with which I agree.  In particular, I agree with the majority that the remedy created by this Court as a way to address exclusionary zoning policies that it found to be unconstitutional, see S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (Mount Laurel II), 92 N.J. 158, 204-05 (1983) (citing S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (Mount Laurel I), 67 N.J. 151, 174, appeal dismissed and cert. denied, 423 U.S. 808, 96 S. Ct. 18, 46 L. Ed. 2d 28 (1975)), and that the Legislature essentially embodied in the Fair Housing Act (FHA), N.J.S.A. 52:27D-301 to -329.4, is not the only constitutionally permissible method for achieving the goal of providing affordable housing.

Like the majority, I agree that the past three decades of experience do not mean that there can be no other way to "produc[e] significant numbers of low- and moderate-income housing" nor does that experience suggest that there are no other potential ways to do so "consistent with statewide planning principles, present space availability, and economic conditions." Ante at ___ (slip op. at 6). Moreover, like my colleagues in the majority, I agree that the remedy that this Court created and "imposed thirty years ago should not be viewed as a constitutional straitjacket to legislative innovation[.]" Ante at ___ (slip op. at 58).

Indeed, I applaud the majority for its willingness not only to recognize that there may be other ways to meet the mandate of Mount Laurel II, but for actively and forcefully encouraging the Legislature to explore new and innovative methods of "curb[ing] exclusionary zoning and promot[ing] the development of affordable housing[.]" Ante at ___ (slip op. at 46).

I write in dissent, however, because, notwithstanding those broad and sweeping pronouncements, the majority's analysis of the approach taken by COAH in the Third Round Rules, and therefore the majority's holding, is flawed. As a result, the Court needlessly demands, as its remedy, rigid adherence to the very policies of the past that the majority simultaneously

2

denounces as a "straightjacket[.]"  Ante at ___ (slip op. at 58).

In the end, although my colleagues in the majority invite the Legislature to chart a new path, their conclusion that the Third Round Rules adopted by COAH are inconsistent with the dictates of the FHA, and their further directive that strict adherence to the methodology of the earlier rounds is the only permissible remedy, leave the Legislature with no guidance concerning what alternate statutory approach might comply with the majority's interpretation of the Constitution.  That lack of guidance, perhaps unintentionally, will greatly diminish the likelihood that the Legislature will attempt a future change of course.

Were that my only disagreement with the majority, it would not have prompted this dissent.  On the contrary, were it true that the Third Round Rules fall so far short of adherence to the FHA that they cannot stand, I would gladly join my colleagues. But they do not.  Instead, as I see it, the Growth Share approach utilized in the Third Round Rules is consistent with both the constitutional mandates of Mount Laurel II and with the dictates of the FHA.

Moreover, if, as the majority concludes, the Third Round Rules lack a sufficient focus on regional needs to meet the

3

majority's interpretation of what the FHA requires, it would be far wiser, and more in keeping with our traditional manner of addressing challenges to administrative agency actions, for this Court to direct COAH to make that minor adjustment rather than to toss aside years of effort and force COAH to don the old straightjacket and rewrite the regulations to mirror those the Court approved in earlier rounds.

I base my disagreement, and therefore my dissent, on what I believe to be two flaws in the majority's analytical approach, which, taken together, have led the majority to impose upon COAH a remedy that is both unnecessary and inappropriate.

I.

First, the statutory construction on which the opinion is based is flawed because the majority has read its view of what the FHA should say into the language that the Legislature chose. That is, instead of considering the language that the Legislature used when declaring its purpose and instead of interpreting the operative sections of the statute in context, the majority has focused narrowly on references to regional approaches. More to the point, in maintaining that narrow focus, the majority has divorced those references from immediately surrounding words that permit a municipal, rather

4

than regional, approach and has ignored the broad statutory language that tethers COAH's role to sound planning principles.

The majority's error is not in its explanation of the history of Mount Laurel I and Mount Laurel II, all of which is fully, faithfully, and carefully recounted. Nor does the error lie in the majority's recitation of the essential facts that led this Court to mandate a solution, borne of frustration at the failure of the other branches of government to achieve a way to end unconstitutional exclusionary zoning practices. Nor is it controversial to observe that the Legislature enacted the FHA at the direction of, and to be consistent with, this Court's requirements in Mount Laurel II.

The FHA, however, bespeaks a more dynamic approach than the one that the majority sees when reading the statute solely through its Mount Laurel II lens. Indeed, only by reading the FHA with the language of the Court in Mount Laurel II in mind, can the majority conclude that there is no room in that statute for the regulatory approach that COAH has adopted in the Third Round Rules. Using standard tools of statutory construction, however, yields a different result.

When called upon to interpret the Legislature's intent, few tools are as helpful as the Legislature's own expression thereof. The FHA, as an example, includes just such language in

the Legislature's statement of its findings, which my colleagues have overlooked, but which is of enormous assistance in the task assigned. Principal among the findings included by the Legislature in the FHA is the expression of that body's understanding of the meaning of Mount Laurel I and Mount Laurel II. The Legislature declared:

> The New Jersey Supreme Court, through its rulings in [Mount Laurel I] and [Mount Laurel II], has determined that every municipality in a growth area has a constitutional obligation to provide through its land use regulations a realistic opportunity for a fair share of its region's present and prospective needs for housing for low and moderate income families.
>
> [N.J.S.A. 52:27D-302(a) (emphasis added).]

That expression is entirely faithful to the historical context in which the dispute over low and moderate income housing arose. The Mount Laurel litigation had its roots in a geographic area of the state in which growth in both housing and population was taking place, but where that growth was being artificially burdened by an exclusionary zoning scheme. See Mount Laurel I, supra, 67 N.J. at 161-64. It was not the growth or lack of growth that created the constitutional crisis; it was the manner in which the municipality attempted to divert low and moderate income families away from wealthier areas in the municipality when growing. See id. at 169-70.

That is not to say that the Legislature made no reference to regional concerns in the FHA, indeed it did, see N.J.S.A. 52:27D-302(e) (referring to regional need in terms of way in which low and moderate housing may be maximized), as had this Court in the Mount Laurel II opinion, see Mount Laurel II, supra, 92 N.J. at 213, 237-38 (recognizing that "zoning in accordance with regional considerations is not only permissible, it is mandated").

But the expressed focus of the Legislature was on growth areas, as a result of which the FHA leaves open the route that COAH, in adopting a Growth Share approach, utilized in the Third Round Rules. If, as I understand it, the Legislature intended to embrace the concept that growth, to the extent that it is occurring, may not be exclusionary, then the Growth Share model adopted by COAH in the Third Round Rules advances that goal and is entirely consistent with the FHA.

My colleagues in the majority, however, read into the FHA their own view of how growth should be channeled, finding a requirement that regional considerations predominate to the exclusion of municipal concerns. There are two shortcomings with that approach.

For one thing, in addition to being inconsistent with the context of the Mount Laurel litigation and the expression of the Legislature in its findings, see N.J.S.A. 52:27D-302(a), it is

7

not faithful to the statutory text.  Notably, in the majority's quotation from the FHA that is intended to prove the point that the statute is largely based on regional concerns, the opinion underscores the words that tend to support that conclusion while ignoring the words "or a municipality" that follow.  Ante at ___ (slip op. at 47) (reciting definition of "prospective need" and quoting N.J.S.A. 52:27D-304(j) with partial emphasis).

For another thing, that approach, and the conclusion that only the regulations from the prior rounds that this Court has previously approved will suffice, creates a never-ending cycle of forced growth everywhere.  It does that by requiring COAH to project what regional needs will be and then by demanding that COAH force municipalities to comply with those projections in an endless, self-fulfilling prophesy of sprawl.

Unlike my colleagues, I see different principles at work in the statute that the Legislature enacted.  The FHA is fundamentally based on concepts that professional planners have long embraced, requiring that COAH consider them in its evaluation of housing obligations.

The reliance on sound planning principles so permeates the FHA that only a few examples are needed to prove the point.  The Legislature included references to the need to revitalize our urban areas through "construction, conversion and rehabilitation

8

of housing in our urban centers[, which] should be encouraged."
N.J.S.A. 52:27D-302(g).  It included those concepts when it
directed COAH to adopt criteria and guidelines:

> Municipal adjustment of the present and prospective fair share based upon available vacant and developable land, infrastructure considerations or environmental or historic preservation factors and adjustments shall be made whenever:
>
> (a) The preservation of historically or important architecture and sites and their environs or environmentally sensitive lands may be jeopardized,
>
> (b) The established pattern of development in the community would be drastically altered,
>
> (c) Adequate land for recreational, conservation or agricultural and farmland preservation purposes would not be provided,
>
> (d) Adequate open space would not be provided,
>
> (e) The pattern of development is contrary to the planning designations in the State Development and Redevelopment Plan . . . ,
>
> (f) Vacant and developable land is not available in the municipality, and
>
> (g) Adequate public facilities and infrastructure capacities are not available, or would result in costs prohibitive to the public if provided.

9

[N.J.S.A. 52:27D-307(c)(2).]


Each of those concerns is directly derived from sound planning principles; each makes clear that the Legislature's intent was not simply to comply with this Court's view of how low and moderate income housing would best be created in accordance with the Constitution.  Instead, the Legislature was trying to ensure that there would be careful recognition of the need to embrace sound planning principles generally.

Nor was COAH directed to perform its duties in some purely mathematically driven manner.  Instead, the Legislature directed COAH as follows:

> In carrying out [its] duties, including, but not limited to, present and prospective need estimations the council shall give appropriate weight to pertinent research studies, government reports, decisions of other branches of government, implementation of the State Development and Redevelopment Plan . . . and public comment. To assist the council, the State Planning Commission established under that act shall provide the council annually with economic growth, development and decline projections for each housing region for the next ten years.

> [N.J.S.A. 52:27D-307(e).]

10

The reference to the State Plan is particularly significant because that document divides the state into regions with an eye toward sound planning, in which growth and development are encouraged in areas where infrastructure already exists and discouraged in regions of our state that are environmentally sensitive or in which development would require addition of new infrastructure.  The State Plan, moreover, seeks to revitalize cities and urban areas rather than to channel new development in ways that simply create sprawl.

Significantly, as the majority recognizes, see ante at ___ (slip op. at 29-30), the Growth Share concept was not created by COAH out of whole cloth, but was instead a model developed by one of the state's preeminent planning experts, see John M. Payne, Remedies for Affordable Housing:  From Fair Share to Growth Share, Land Use L. & Zoning Dig., June 1997, at 3, 3.  More to the point, it was the creation of a planner who was an advocate for affordable housing, see ante at ___ (slip op. at 29 & n.5), and was specifically designed to remedy a series of methodological shortcomings evident to him in the regulations COAH promulgated in the first two rounds, see Payne, supra, Land Use L. & Zoning Dig., June 1997, at 3-6.  Growth Share, which was his solution, was designed to be a way to ensure that there would be an adequate supply of low and moderate income housing

11

without abandoning sound planning concepts and without continuing the escalating pattern of sprawl that inevitably followed from the First and Second Round COAH regulations.  Id. at 6.

Significantly, in adopting the Growth Share model for use in the Third Round Rules, COAH did not utilize a "pure" Growth Share approach, see ante at ___ (slip op. at 45 n. 15 (citing Payne, supra, Land Use L. & Zoning Dig., June 1997, at 6-9)), because it did not erase the obligations that had been imposed on municipalities in earlier rounds but that had never been satisfied.  Instead, those prior, unmet, obligations were retained in the Third Round Rules adopted by COAH.  As a result, this Growth Share model, that my colleagues in the majority now reject as being incompatible with the FHA, remained faithful to the statute by honoring the residual effects of prior round obligations on municipalities that this Court had previously deemed constitutional.

The several references in the FHA to regional concerns on which the majority relies are not inconsistent with a Growth Share model.  On the contrary, seen in light of the expressed Legislative findings, see N.J.S.A. 52:27D-302, the theory is aligned with the statutory focus on areas in which growth is occurring.  The references to regional concerns, at most, would

require only that the calculation of a municipality's fair share be made not only on a state-wide basis, as the Third Round Rules require, but would include a regional component as well.

Therefore, if the majority is correct that the FHA is essentially driven by regional considerations, then it is only in that minute regard that they can conclude that the version of a Growth Share approach embodied in the Third Round Rules is inconsistent with the statute. That is, the Third Round uses a formula that requires growth anywhere in the state to carry with it the same requirement, statistically, for low and moderate income housing, rather than recognizing that different regions of the state, particularly if one considers the regions identified by the State Plan, should lead to different requirements for low and moderate income housing.

The majority concludes that the lack of a regional calculation is so inconsistent with the FHA that the Third Round Rules are ultra vires; they conclude that the inconsistency is so significant that there is no possible remedy but to reject these regulations in their entirety in favor of starting over and creating new ones that mirror the prior two rounds. Even if the majority's analysis of the purported flaw in the Third Round Rules is correct, there is nothing in that relatively minor deviation that demands so drastic a remedy.

II.

That observation, that the remedy imposed by my colleagues is unnecessary, leads to the second basis for my dissent. In short, by demanding that COAH adopt regulations that continue on the path followed over the past thirty years, the majority has impermissibly interfered with the authority that the Legislature vested in that administrative agency and has failed to give COAH the deference that we routinely afford the final decisions of every other administrative agency.

Our case law is replete with examples of our recognition that, where a determination has been made by an administrative agency, our scope of review is both narrow and deferential. See Brady v. Bd. of Review, 152 N.J. 197, 210-11 (1997); see also Lourdes Med. Ctr. v. Bd. of Review, 197 N.J. 339, 360 (2009). We have long recognized that when the Legislature has delegated power to an agency, "[t]he grant of authority . . . should be liberally construed to enable the agency to accomplish the Legislature's goals." Van Dalen v. Washington Twp., 120 N.J. 234, 245 (1990). When an agency acts in accordance with its delegated power, its actions are "accorded a strong presumption of validity and reasonableness." Id. at 244-45.

In creating COAH, the Legislature granted it authority to carry out the statutory directives, including the directive that

14

COAH promulgate regulations in furtherance of the goals expressed in the FHA. N.J.S.A. 52:27D-307.5; see Hills Dev. Co. v. Twp. of Bernards, 103 N.J. 1, 60-61 (1986). More to the point, as we have held, COAH's regulations are entitled to an especially deferential standard of review because of that agency's unique mandate in implementing the FHA and its role in achieving compliance with the Mount Laurel doctrine. See In re Twp. of Warren, 132 N.J. 1, 27 (1993) (observing that "principle of judicial deference to agency action is particularly well-suited to our review of administrative regulations adopted by COAH to implement the [FHA]"); Hills Dev. Co., supra, 103 N.J. at 45-46.

As we have directed in this precise context, "the judiciary, assuming the statutory plan functions reasonably effectively, will be responsive to the actions of the Council and conform its decisions in this field to the Council's various determinations." Hills Dev. Co., supra, 103 N.J. at 37; see id. at 24 (noting that because legislative and administrative action is preferable to judicial action relating to affordable housing, Legislature is entitled to "particularly strong deference").

To be sure, we have recognized that, if a regulation that has been promulgated is contrary to the legislative policies that underlie the administrative agency's enabling statute, or

15

when a regulation "does not comport with [the statute's] central purpose," it cannot stand. Twp. of Warren, supra, 132 N.J. at 28 (invalidating municipal occupancy preferences as inconsistent with aims of FHA). We likewise have expressed our preference for harmonizing judicial action with COAH's regulatory determinations, although recognizing that the effort to harmonize cannot be used to justify the "dilu[tion of] COAH's duty to adopt regulatory methods that are consistent with the statutory goals." Ibid.; see Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 572-73 (2002).

Deference to an administrative agency, including COAH, does not extend to arguments that its regulations violate our Constitution. See Abbott v. Burke, 100 N.J. 269, 298-99 (1985) ("[A]lthough an agency may base its decision on constitutional considerations, such legal determinations do not receive even a presumption of correctness on appellate review."). On the contrary, as we have held, "constitutional concerns or the dictates of legislative intent have at times compelled us to decline adoption of doctrines or statutory interpretations that have been favored by [an agency.]" In re Hunterdon Cnty. Bd. of Chosen Freeholders, 116 N.J. 322, 328 (1989).

That being so, unless this Court can conclude with assurance that the action of the agency was ultra vires, or that

its regulation is plainly unconstitutional, we ordinarily stay our hand. See Lourdes, supra, 197 N.J. at 361. Even when we conclude that regulations fall short, in recognition of the expertise that the agency has in the matter, the more appropriate course, and the one traditionally used in regard to COAH, is to remand to the agency to exercise its discretion as to how to proceed. See, e.g., In re Adoption of N.J.A.C. 5:94 & 5.95, 390 N.J. Super. 1, 87 (App. Div.), certif. denied, 192 N.J. 71 (2007); In re Six Month Extension of N.J.A.C. 5:9-1 et seq., 372 N.J. Super. 61, 104-05 (App. Div. 2004), certif. denied, 182 N.J. 630 (2005).

Applying these precedents to the matter now before the Court, to the extent that the majority believes that the shortcoming in the Third Round regulations is the lack of a formula with a regional component, the appropriate remedy would be a remand to COAH to make what should be a relatively routine correction. By eschewing that traditional approach and by directing that COAH essentially craft an entirely different regulatory scheme, albeit one based on the methodology embodied in the prior rounds of regulations, the majority has ignored our tradition of deference to agency expertise and has overstepped its authority.

Moreover, in doing so, the majority has failed to recognize the relatively wide scope of authority that the Legislature, through enacting the FHA, has reposed in COAH.  Far from being a carefully circumscribed or limited grant of authority, the statute affords much discretion to COAH.  See, e.g., N.J.S.A. 52:27D-307 (identifying duties and authority granted to COAH). The majority, however, has ignored that legislative determination and instead has concluded that it is the Legislature that must act, apparently through an amendment to the FHA, if there is to be any departure from the regulatory scheme this Court permitted in the first two rounds.  See, e.g., ante at ___ (slip op. at 51) ("To sum up, the Legislature has to enact an alternative remedy -- such as some version of the one proposed by COAH in the Third Round Rules -- in order for that remedy to be statutorily permissible.").

In taking that stand, the majority has announced that only the Legislature can alter the approach as to how an adequate supply of low and moderate income housing will be achieved.  In the process, the majority has removed all discretion from COAH, replacing the scheme that the Legislature enacted with a directive that prevents COAH from innovation of any kind and that serves only to perpetuate the policies that have not truly achieved the goal of ensuring that an adequate supply of

18

affordable housing will be made available for people of all income levels in our state.

As I understand our role, we owe COAH the same deference accorded any other agency when we evaluate its decision or the exercise of its rulemaking authority.  Offering no guidance and instead substituting its view of the only statutorily permissible approach, the majority greatly diminishes the likelihood that either COAH or the Legislature will take the initiative for change that the majority intends to encourage. The effect of the demand that the agency adhere to the policies of the past instead will serve as a disincentive to true innovation by the Legislature because, in the absence of guidance from this Court about what approach, other than the one dictated by this Court three decades ago, will be found to be constitutional, that body more likely will continue on the previously approved course.

To the extent that the extensive study and analysis undertaken by COAH in devising the Growth Share approach embodied in the Third Round Rules may be flawed, it is only because the majority remains wedded to the methodologies imposed in the past.  To the extent that the majority, in substituting its view of what the FHA demands for the language that the Legislature used, reads the statute to exclude the creative and

19

innovative approach that Growth Share represents, it risks subjecting us to an endless cycle of repeating that which has not worked in the past.  To the extent that the majority concludes that the Third Round Rules fall short, the appropriate, and indeed the preferable, remedy would be to identify that shortcoming and permit it to be addressed by the agency that the Legislature created, not to mandate that the agency undertake what is essentially an overhaul of regulations so that they utilize a formula of the majority's choosing.

Because in my view the Third Round Rules are not inconsistent with the statutory mandates derived from this Court's decisions in Mount Laurel I and Mount Laurel II, I would reverse the Appellate Division's direction that we return to the approach used in the First and Second Round.

III.

The majority's recognition that the dictates of Mount Laurel I and Mount Laurel II are not the only constitutionally permissible methods for achieving the provision of adequate low and moderate income housing is a conclusion with which I agree. To the extent, however, that the majority concludes that the Third Round Rules adopted by COAH are so flawed that they must be replaced with the approach utilized in the past, I respectfully dissent.

JUSTICE PATTERSON joins in this opinion.

SUPREME COURT OF NEW JERSEY

NO.   A-90/91/92/93/94           SEPTEMBER TERM 2010

ON CERTIFICATION TO        Appellate Division, Superior Court


IN THE MATTER OF THE ADOPTION
OF N.J.A.C. 5:96 AND 5:97 BY
THE NEW JERSEY COUNCIL ON
AFFORDABLE HOUSING.


DECIDED        September 26, 2013
               Justice LaVecchia              PRESIDING
OPINION BY       Justice LaVecchia
CONCURRING/DISSENTING OPINIONS BY
DISSENTING OPINION BY       Justice Hoens

| CHECKLIST | AFFIRM AS MODIFIED | REVERSE |
|---|---|---|
| CHIEF JUSTICE RABNER | ----------------------- | --------------------- |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE HOENS | | X |
| JUSTICE PATTERSON | | X |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | ------------------------ | ----------------------- |
| TOTALS | 3 | 2 |

1